# THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| INFORMATION ASSOCIATED WITH ) | |
| "cheyenneandliberty@yahoo.com" ) | |
| THAT IS STORED AT PREMISES ) | Case No.   13-mj-5051-KGS |
| CONTROLLED BY ) | |
| YAHOO! INC. ) | |
| 701 FIRST AVENUE ) | |
| SUNNYVALE, CA 94089 ) | |
| _____ ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, Cassidy D. Casner, being first duly sworn state:

### INTRODUCTION

1.  I am a Special Agent of the Department of Homeland Security, Immigration and Customs Enforcement currently assigned to the Homeland Security Investigations, Kansas City, Missouri, and have been so employed since August 5, 2007.  I was previously employed as an Immigration Enforcement Agent for the Department of Homeland Security.  Before becoming a federal agent, I was a Probation and Parole Officer with the State of Missouri Department of Corrections for three years.  I have had the opportunity to participate in and conduct investigations relating to the sexual exploitation of children.  I have also had the opportunity to observe and review examples of child pornography in various forms of media, and have received training and instruction in the field of investigation of child pornography.

2.  This affidavit is made in support of an application for a warrant to search the e-mail account **cheyenneandliberty@yahoo.com** in the name of Chey Cheychey.  As will be shown below, there is probable cause to believe an individual utilizing an e-mail account has distributed, received, attempted to receive, and possessed child pornography, all in violation of Title 18, United States

1

Code, Section 2252.  I am submitting this affidavit in support of a search warrant authorizing a search of the Yahoo! account listed in the respective **Attachment A** ("Location to be Searched"), for the items specified in **Attachment B** ("Items to be Seized") hereto, which consitiute contraband, instrumentalities, and evidence of the foregoing violations.

3.      This affidavit is in support of a search warrant application for information associated with Yahoo! account as listed on Attachment A and stored at premises controlled by Yahoo! Inc., 701 First Avenue, Sunnyvale, CA 94089.

4.      Based upon your Affiant's review of the evidence to date, and as set forth below, I believe the referenced Yahoo! e-mail account to contain items, more fully described in **Attachment B** (incorporated herein by reference), which constitute evidence, fruits, and instrumentalities of violations of federal computer crime and child exploitation laws, namely, Title 18, United States Code, Sections 2252 and 2256.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  It is anticipated that the items sought by these warrants will be retrieved by law enforcement officers, as well as the respective corporate employees and provided to HSI as authorized by Title 18, United States Code, Section 2703 (g).   A Preservation letter for items located in the aforementioned account was faxed to Yahoo! on May 6, 2013.

## BACKGROUND OF INVESTIGATION

5.      On April 28, 2013, the Homeland Security Investigations (HSI) Cyber Crime Center (C3), Child Exploitation Investigations Unit (CEIU) Victim Identification Program (VIP) received a referral from the Queensland Police Service regarding the distribution and production of child exploitation material and the identification of a potential contact abuser.  An individual utilizing the email address cheyenneandliberty@yahoo.com had initiated contact with a Queensland Police Service Covert Internet Investigator (hereinafter will be referred to as investigator).

6. On April 16, 2013, cheyenneandliberty@yahoo.com emailed the investigator stating, "Dad of four, found you in imgsru. Be fun to talk, swap, or whatnot. :-) ~Jeff  ProudPapa <3".[1] Cheyenneandliberty@yahoo.com sent one non-exploitive image of a girl on playground equipment. On April 19, 2013, the investigator responded, asking where cheyenneandliberty@yahoo.com lived and the investigator stated he resided in "Oztralia."

7. On April 19, 2013, cheyenneandliberty@yahoo.com wrote, "I'm from Kansas. Get back to you soon ☺". He then wrote, "Do you ever make it to the USA?" The investigator responded that he does travel. Cheyenneandliberty@yahoo.com wrote, "I am brand new to this thought process the beauty I see in the pictures on imgsru and all that. I wouldn't mind getting to know you. Are you by chance a photographer? I'm 38, single dad to four girls, 4 ½, 10 yo twins, and 13. Tell me a little about you and, if you have kids, yours."

8. On April 22, 2013, the investigator responded stating he was not a professional photographer and that he had sexual contact with his girlfriend's two children. Cheyenneandliberty@yahoo.com responded, "Wow… ☺ I haven't gotten that far yet☺ but I'm starting out. Maybe we could get out girls to become friends☺ ya never know." Thirty minutes later, cheyenneandliberty@yahoo.com then sent an email with a dropbox URL that contained three videos. Your affiant has viewed the videos described as follows:

a. A video entitled A12.avi was approximately 13 minutes long and depicted a female child estimated to be between the ages of 4-6 is shown in various stages of undress (mostly totally nude or wearing only a t-shirt) dancing and jumping on a bed, or posing in front of a mirror. During the video the photographer focused on the child's genitalia numerous times. The video is captioned with www.LittlePassion.com.

---

[1] The web site "www.imgsrc.ru" is a free Internet hosting website that allows individuals to create an individual user account on the website and allows that user to use the website to upload images and post comments to other "imgsrc.ru" user accounts photo albums.

      b.      A video entitled A14.avi was approximately 4 minutes and 44 seconds long and depicted a nude female estimated to be between the ages of 10-14 years in a shower.  The child was dancing and posing in the shower.  The child was also depicted rubbing and touching her breasts and genitalia with her hands.

      c.      A video entitled A15.avi was approximately 4 minutes and 28 seconds long depicted a female estimated to be between the ages of 10-14 years dancing in what appears to be a living room.  The child was at first fully clothed and then began removing her clothing in a provocative manner until fully nude.  The child is also depicted rubbing and touching her breasts and genitalia with her hands.

      Cheyenneandliberty@yahoo.com wrote, "It'd be cool to find someone like you to do a photo shoot of each of mine☺."  The investigator downloaded these images from the dropbox URL.

      9.      On April 28, 2013, Cheyenneandliberty@yahoo.com then sent two emails each with the image of a young child from the waist down lying down, wearing what appears to be a diaper, white in color with pink stripes.  Cheyenneandliberty@yahoo.com sent a third email with an image of the same child, and in the image an adult hand is pulling aside the diaper to display the genitalia of a female who appears to be under the age of six.  Cheyenneandliberty@yahoo.com then wrote on April 28, 2013, "☺ just took a couple ☺".  All three images appeared to be taken at the same instance because the female child was lying on top of a white sheet with a pink and yellow flower design.  Also depicted in one of the images was a green blanket with a green plaid design.  In this same image the child is wearing a primarily pink with gray and black dress with ruffles.  Exif data on the pictures indicate they were taken with an Apple iPhone 4S a few minutes prior to his email.[2]

---

2  EXIF stands for Exchangeable Image File and is a format for storing interchange information in digital photography image files. Cameras that use the EXIF annotation store information on the images such as the date and time the image was taken, camera model, camera settings, global positioning system (GPS), etc.

4

10.     On April 30, 2013, HSI C3 VIP sent legal process to Yahoo! for the email address Cheyenneandliberty@yahoo.com.  In response, Yahoo! indicated that account was created on December 27, 2012 at 10:40:37 GMT from the IP address 99.18.221.137.  The name associated with the account was Chey Cheychey.  The log history ranged from December 27, 2012 through April 29, 2013, using both AT&T landline/residential and mobile phone service.

11.     On May 1, 2013, HSI C3 VIP sent legal process to AT&T for the landline/residential IP addresses used to access the email account cheyenneandliberty@yahoo.com.  On May 3, 2013, AT&T responded that three of the four IP addresses were subscribed to by KEARNE HEATING at                    Topeka, KS 66603.  The contact name on the account was listed as Jonathan KEARNE and the contact phone numbers as

12.     On May 3, 2013, HSI Kansas City Special Agents received the aforementioned information and began open source research on Jonathan KEARN.  Agents found that Jonathan E. KEARN, date of birth            (presently age 38), resided at                    Topeka, Kansas, 66603.  Agents also found KEARN was listed as the Registered Agent for Kearn-Wood Heating and Cooling LLC., located at                    Topeka, Kansas.  An ad in Craigslist dated 3/23/13 and in PANDA-Hi dated 1/22/13, listed heating and cooling services for Kearn-Wood Heating and Cooling LLC.  The listed phone number was                    and Jon KEARN's cell phone number,

13.     On May 3, 2013, HSI Kansas City Special Agents identified a Facebook account belonging to Jonathan KEARN (Jon KEARN) living in Topeka, Kansas.  The Facebook account included multiple photos of four girls he listed as his daughters, two are named "Cheyenne" and "Liberty".  One image posted on the account depicts a female child between the ages of 4-6 wearing a long red dress in an outdoor setting.  The investigator in this case identified this photo as the same photo he received from cheyenneandliberty@yahoo.com on April 19, 2013.  Another photo posted

on the KEARN's Facebook account depicts an adult wearing a cat costume from the "Cat in the Hat" book and movie posed on a porch of a residence. The home appears to be gray in color and the numbers 4 2 9 were displayed vertically on the trim around the door of the home. Two doors were displayed in the photo, a storm door with black rod iron and a wood door with a glass window that leads into the residence.

14. On May 7, 2013, in the United States District Court District of Kansas the Honorable K. Gary Sebelius, United States Magistrate Judge signed a search warrant for Topeka, KS.

15. On May 7, 2013, at approximately 4:50 p.m., HSI Kansas City Special Agents and Investigators with the Topeka, Kansas Police Department executed the aforementioned search warrant at                         Topeka, Kansas. Agents seized numerous items including an IPhone 4S, several computers, digital media, a bed sheet matching the sheet described in Paragraph 6, a green blanket matching the blanket described in Paragraph 6, a diaper matching the diaper described in Paragraph 6, and a child's dress matching the dress described in Paragraph 6.

16. On May 7 and 8, 2013, Detective Patrick Ladd of the Topeka Police Department performed an acquisition of digital media storage contained on an Apple IPhone 4S that was seized from KEARN's home on May 7, 2013. KEARN identified the phone as his phone at the time of the search warrant. The IPhone was found Password locked. KEARN gave HSI Agents the password to access the phone's content. The following images of child pornography/erotica were retrieved from the IPhone:

a. An image entitled img1 depicted a female child between the ages of 3-5 holding up her pink dress, wearing no undergarments, revealing her genital area.

b. An image entitled img2 depicted a female child between the ages of 4-6 standing fully nude on a chair.

c.      An image entitled img3 depicted a female child between the ages of 4-6 standing in a pose with her rear to the camera and turned from the waist holding a food item in her hands with her mouth opened widely.  The child is wearing a blue shirt and white pants that reveal an undergarment beneath.

d.      An image entitled img4 depicted a female child between the ages of 3-6 in a bent over position on what appears to be a bed with an adult hand pulling down her undergarments revealing a graphic display of her genital area.  The image has a caption in the lower corner of an icon described as a blue male sign with a smaller female sign hanging off the arrow of the male sign, with "Kiddielover Collection" written next to the icon.

e.      An image entitled img5 depicted two female children between the ages of 4-6 standing with their backs to the camera.  One female child is fully nude with her rear exposed. The other female child is wearing white underwear.

f.      An image entitled img6 depicted a female child between the ages of 7-10 posing against a wall with her breasts fully exposed and wearing underwear.

g.      An image entitled img7 depicted a female child between the ages of 5-8 siting on a floor with her knees up, exposing a graphic display of her genital area.  The child is wearing a long dress or nightgown.

h.      An image entitled img8 depicted a female child between the ages of 9-12 appearing to be sitting in a bathtub with her breasts fully exposed.

i.      An image entitled img9 depicted a female child between the ages of 8-12 standing in a bedroom with her breasts fully exposed and wearing underwear. The child appears to have a candy sucker in her mouth.  The background of the photo depicted two other children lying on a bed, one can be seen from the waist up with their breasts exposed, the other with only the legs and feet visible.

j.      An image entitled img10 depicted a female child between the ages of 10-14 posed

fully nude. The child is posed so that her legs are separated revealing her genital area.

      k.      An image entitled img11 depicted a female child between the ages of 5-8 posing on her stomach with her legs bent. The child is clothed in a dress that is sheer at the bottom revealing her buttock.

      l.      An image entitled img12 depicted a female child between the ages of 3-5 wearing a multi-colored jacket, a ruffled pink dress with gray, pink, and black stripes, and pink cowboy boots. The child's dress is pushed up revealing her undergarment. Your affiant recognizes the dress as the same dress as described in Paragraph 6 and that it was seized as evidence on May 7, 2013. Your affiant also recognizes the pink cowboy boots as the boots that KEARN's youngest daughter, CK, put on herself during the execution of the search warrant on May 7, 2013.

      m.      An image entitled img13 depicted a female child between the ages of 3-5 bent over what appears to be a bench seat of a vehicle, the focus of the camera being on the child's rear and legs. A pink ruffle is visible under a multi-colored coat. The child is wearing underwear but the bottom of the child's buttocks are exposed. The child is wearing the same cowboy boots as described in Paragraph 12, Subparagraph l.

      n.      Images entitled img14, img15, and img16 depicted the same image as described in Paragraph 12, Subparagraph m. The images varied in that the child slightly moved the position of her leg and/or the photographer slightly moved the camera.

      o.      An image entitled img17 depicted a female child between the ages of 3-5 wearing a multi-colored jacket, a ruffled pink dress with gray, pink, and black stripes, and pink cowboy boots. The child's dress is pushed up revealing her undergarment. Your affiant recognizes the dress as the same dress as described in Paragraph 6 and that it was seized as evidence on May 7, 2013. Your affiant also recognizes the pink cowboy boots as the boots that KEARN's youngest daughter, CK, put on herself during the execution of the search warrant on May 7, 2013.

p.	An image entitled img18 depicted a female child between the ages of 3-5 sitting on a toilet.  The child's genitalia are not exposed.  The child is wearing a ruffled pink dress with gray, pink, and black stripes and a sequined heart, and pink cowboy boots.  The child is also wearing multi-colored pants that are pushed down over her boots.  Your affiant recognizes the dress as the same dress as described in Paragraph 6 and that it was seized as evidence on May 7, 2013.  Your affiant also recognizes the pink cowboy boots as the boots that KEARN's youngest daughter, CK, put on herself during the execution of the search warrant on May 7, 2013.

q.	An image entitled img19 depicted a female child between the ages of 3-5 standing next to a toilet holding up her dress, exposing her stomach, genital area, and thighs, appearing to have completed using the bathroom.  The child is wearing a pink ruffled dress with a female child between the ages of 3-5 wearing, a ruffled pink dress with gray, pink, and black stripes, multi-colored pants, and pink cowboy boots.  Your affiant recognizes the dress as the same dress as described in Paragraph 6 and that it was seized as evidence on May 7, 2013.  Your affiant also recognizes the pink cowboy boots as the boots that KEARN's youngest daughter, CK, put on herself during the execution of the search warrant on May 7, 2013.

r.	An image entitled IMG_8192 depicted a photo of KEARN's youngest daughter, CK wearing a long red dress.  This image is the same photo found on KEARN's Facebook account and was a photo that was sent to the Queensland Police Service Covert Internet Investigator as described in Paragraph 10.

s.	A video entitled video(1).mov depicted a female child between the ages of 3-5 lying on a bed wearing only an orange shirt and is nude from the waist down.  The bed sheet and blanket on the bed are the same as described in Paragraph 6.  The video is 21 seconds long.  At the 8 second mark the camera moves to the bare rear of the child and zooms in to graphically display the butt and genital area of the child.  The child then rolls over exposing her genital area from the front.  The

video does not show the child's face but through the audio of the video your Affiant recognized the child's voice as CK, age 4, KEARN's youngest daughter, and recognized the other voice as that of KEARN.

    t.    A video entitled video(2).mov depicted a female child between the ages of 3-5 wearing only an orange shirt and is nude from the waist down. The bed sheet and blanket on the bed are the same as described in Paragraph 6. The video is 10 seconds long. The video starts with the child lying on the bed with her legs spread exposing her genital area. The video continues with the child jumping on the bed, keeping the focus of the camera being on the lower body of the child. At the end of the video, a portion of the child's face is visible and your Affiant recognized the child as KEARN's youngest child, CK, age 4. Your affiant also recognized the voice of the recorder as that of KEARN's.

    17.    Based on her experience and investigations, your Affiant has reason to believe that KEARN's e-mail account, cheyenneandliberty@yahoo.com, may contain evidence of attempts to communicate and trade child pornography with other individuals, including those communications with the Queensland Investigator, he has associated with via email. In addition, potential evidence may lead to information that would assist this investigation in determining the identity of those individuals using those e-mail accounts, and identifying other potential victims.

## STATUTORY AUTHORITY

    18.    The legal authority for this search warrant application is derived from 18 U.S.C. §§ 2701-11, entitled, stored wire and electronic communications and transactional records access.

    19.    18 U.S.C. § 2703(c)(A) allows for nationwide service of process of search warrants for the contents of electronic communications. Pursuant to 18 U.S.C. § 2703, as amended by the USA PATRIOT Act, Section 220, a government entity may require a provider of an electronic communication service or a remote computing service to disclose a record or other information

pertaining to a subscriber or customer of such service pursuant to a warrant issued using procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

20. Title 18 U.S.C. § 2703 further states in part:

(a) Contents of Wire or Electronic Communications in Electronic Storage.  A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant.  A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communication system for more than one hundred and eighty days by the means available under subsection (b) of this section.

(b) Contents of Wire or Electronic Communications in a Remote Computing Service.    (1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection. (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant....

21. 18 U.S.C. § 2703(c)(2) adds that a provider of an electronic communication service or remote computer service must also provide, without notice to the customer, the name, address, connection records, length of service, and means of payment pursuant to a search warrant.

22. Title 18, United States Code, Section 2252(a)(2), prohibits any individual from receiving or distributing any visual depiction using any means of interstate or foreign commerce, or that has been mailed, or has been shipped or transported, in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any

means including by computer.

23. Child pornography is defined by Title 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.  Sexually explicit conduct is defined in 18 U.S.C. § 2256(2)(A) as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, (b) bestiality, (c) masturbation, (d) sadistic or masochistic abuse, or (e) lascivious exhibition of the genitals or pubic area of any person.

## DEFINITIONS

24. The following definitions apply to this Affidavit and Attachment B to this Affidavit:

a. "Child Erotica," as used herein, means materials demonstrating a sexual interest in minors, including fantasy narratives, cartoons, and books describing or alluding to sexual activity with minors, sexual aids, children's clothing catalogues, and child modeling images.

b. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

c. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices);  peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d. "Computer software," as used herein, is digital information which can be interpreted

by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

e.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

f.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

**CHARACTERISTICS OF CHILD PORNOGRAPHY COLLECTORS AND DISTRIBUTORS**

25.     I know from my training and experience that the following characteristics are prevalent among individuals who engage in the possession, receipt, and distribution of child pornography:

a.      The majority of individuals who engage in the possession, receipt, and distribution of child pornography are persons who have a sexual attraction to children. They receive sexual

13

gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b.      The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their sexual fantasies involving children.

c.      The majority of individuals who engage in the possession, receipt, and distribution of child pornography often seek out like-minded individuals, either in person or via the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, peer-to-peer, e-mail, bulletin boards, Internet relay chat, newsgroups, instant messaging, and other similar vehicles.

d.      The majority of individuals who receive and possess child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

e.      The majority of individuals who receive and possess child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange or commercial profit.

f.      The majority of individuals who receive and possess child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect their collection of illicit materials from discovery, theft, and damage.

## **COMPUTERS AND CHILD PORNOGRAPHY**

26.     Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

27.     Digital cameras and cell phone cameras allow photographs to be transferred directly onto a computer for viewing or storing.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.

28.     The size of the electronic storage media (commonly referred to as the hard drive)

used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.

29.     The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

30.     Collectors of child pornography may also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

31.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.  Such information is often maintained indefinitely until overwritten by other data.

**INFORMATION THAT MAY BE AVAILABLE FROM YAHOO!**

32. In my training and experience, I have learned that companies that offer e-mail service such as Microsoft, AOL, Google, and Yahoo! (hereinafter "e-mail service providers") provide a variety of on-line services, including electronic mail ("e-mail") access, to the general public. These e-mail service providers allow subscribers to obtain e-mail accounts at their domain names (such as hotmail.com and live.com (Microsoft), aol.com (AOL, Inc.), google.com (Google) and yahoo.com (Yahoo!). Subscribers obtain an account by registering with those respective companies. During the registration process, these e-mail service providers ask subscribers to provide basic personal information. Therefore, the computers of these companies are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for the e-mail subscribers) and information concerning subscribers and their use of these e-mail provider's services, such as account access information, e-mail transaction information, and account application information.

33. In general, an e-mail that is sent to a Yahoo! subscriber is stored in the subscriber's "mail box" on those companies respective servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Yahoo!'s servers indefinitely.

34. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Yahoo!'s servers, and then transmitted to its end destination. Yahoo! often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from Yahoo!'s server, the e-mail can remain on the system indefinitely.

35. Sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Yahoo! but may not include all of these categories of data.

36. A subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Microsoft.

37. Subscribers to Yahoo! might not store on their home computers copies of the e-mails stored in their respective accounts. This is particularly true when they access their accounts through the web, or if they do not wish to maintain particular e-mails or files in their residence.

38. In general, Yahoo! asks each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

39. Yahoo! typically retains certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the various websites), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

40. In some cases, e-mail account users will communicate directly with Yahoo! about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Yahoo! typically retains records about such communications, including records of contacts

between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

41. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

## CONCLUSION

42. Based upon the above information, your Affiant asserts that probable cause exists to believe there has been a violation of Title 18, United States Code, Sections 2252 and 2256, which prohibits distributing, receiving, possessing, or accessing with the intent to view, using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, child pornography; and that evidence of those violations exist and are located within the identified Yahoo! e-mail account.

FURTHER AFFIANT SAYETH NOT.

s/Cassidy D. Casner
Cassidy D. Casner, Special Agent
Homeland Security Investigations

Subscribed and sworn before
me this 4th day of June, 2013.

s./K. Gary Sebelius
HONORABLE K. GARY SEBELIUS
UNITED STATES MAGISTRATE JUDGE